IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2014 JUN -2 PM 4: 38

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

THE ESTATE OF DAMION MICHAEL
SCHROEDER, by and through the personal
representatives Michael Schroeder and Sandra L.
Keyser; and ANNE M. CLANCEY, as guardian of
L.G.C., Heir of Damion Michael Schroeder,
                                        Plaintiffs,

-vs-                                              Case No.  A-12-CA-1139-SS

GILLESPIE COUNTY; GILLESPIE COUNTY
SHERIFF'S DEPARTMENT; SHERIFF BUDDY
MILLS; and DEPUTY REAGAN GIVENS,
                                        Defendants.

ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and

specifically Defendants' Motion for Summary Judgment [#18], Plaintiffs' Response [#24],

Defendants' Reply [#28], Plaintiffs' Sur-Reply [#30], Defendants' Supplement to their Motion for

Summary Judgment [#42], and Plaintiffs' Response to Defendants' Supplement [#44].  Having

reviewed the documents, the governing law, and the file as a whole, the Court now enters the

following opinion and orders GRANTING summary judgment on all claims EXCEPT the policy-

related § 1983 claims against Gillespie County and Sheriff Mills in his official capacity.

**Background**

This case involves the suicide of Damion Michael Schroeder while he was a pretrial detainee

at the Gillespie County Jail.  Schroeder came into the custody of Gillespie County after he was

pulled over on his motorcycle in a traffic stop shortly after midnight on May 5, 2011.  Schroeder was

subsequently arrested, and the officer noted in his report that Schroeder exhibited the signs and symptoms of an individual under the influence of methamphetamine. *See* Defs.' Mot. Summ. J. [#18-5], Ex. E (Texas Ranger Report), ¶ 1.6. Schroeder complained of a shoulder injury incurred during the traffic stop, and the officer summoned Emergency Medical Services (EMS), which ultimately transported Schroeder to Hill Country Hospital in Fredericksburg to be further examined. Schroeder admitted to staff at the emergency room, and he tested positive for, methamphetamine use. *Id.* at ¶ 1.9. He was discharged at 3:20 a.m. and transported to the Gillespie County Jail. *Id.* He was in custody of Gillespie County for Evading Arrest or Detention with a Vehicle, Driving While Intoxicated, Driving While License Invalid, and two out-of-county warrants. *Id.* at ¶ 1.10.

Upon arrival, Schroeder was lethargic and unable to go through the normal booking process, so he was placed in cell A-1 until he could answer routine booking questions. At 11:40 a.m., Jailer Travis Burrer woke Schroeder to summon him to complete the booking process, but Schroeder told him he needed more sleep. Approximately twenty minutes later, Burrer heard noises coming from Schroeder's cell, and he along with Jailer Rick Carter went to check the cell. They observed Schroeder lying on the floor with an abrasion on his cheek. They also noticed Schroeder had torn a strip from a jail blanket and fastened it to the underside of a bench support brace. When questioned, Schroeder apparently said he was trying to make a pillow, but Burrer did not believe him, instead concluding Schroeder was probably trying to hang himself. *Id.* at ¶ 1.15. Schroeder was then formally booked around 12:30 p.m. and placed into Cell E under "suicide watch." *Id.* at ¶ 1.16. Cell E is an "Intensive Supervision Cell," which is the closest cell to the booking area where the jailer is stationed. *Id.* Cell E has a steel door, and the door has a small "window" made from expanded metal through which jailers can observe the inmate. *Id.* at ¶ 1.26. To actually see an

inmate, a jailer must open a plate covering the window in order to peek into the cell.  According to Burrer, Schroeder was wearing a paper suit from the hospital and two different colored socks at the time he was placed in Cell E.  *Id.*

Under suicide watch, Schroeder was checked on at approximately fifteen minute intervals ~~as~~ *required per the then existing policy.* At the Gillespie County Jail, jailers on suicide watch duty record every time they conduct an observation on a form known as an "Inmate Welfare Check" form.  *Id.* at ¶ 1.17.  Burrer maintained the suicide watch at least until 6:00 p.m. when Jailer Robert Kenzie came on duty.  Kenzie monitored Schroeder through the night until Jailer Reagan Givens took over around 6:00 a.m. on May 6, 2011.

Givens knew Schroeder entered the jail the previous day but had not been immediately booked due to intoxication.  *Id.* at ¶ 1.20.  Givens learned from other personnel Schroeder was in Cell E because he had possibly tried to hang himself on a bunk support brace.  *Id.* at ¶ 1.21; Defs.' Mot. Summ. J. [#18-2], Ex. B (Givens Depo.), at 87:2–6.  Givens was told this event explained why Schroeder was under suicide watch and being checked every fifteen minutes.  Givens Depo., at 87:7–9.  Around 7:00 a.m. Givens took Schroeder out of his cell to be magistrated, and Givens noted Schroeder was barefoot.  Texas Ranger Report, at ¶ 1.22.  After magistration, Givens returned Schroeder to his cell.  Givens continued to check on Schroeder every fifteen minutes throughout the morning, and during this time Schroeder was lying down on his mat faced away from Givens.  *Id.* at ¶ 1.24.

Defendants provided a DVD with footage from the surveillance camera in place at the Gillespie County Jail on the date in question.  *See* Defs. Mot. Summ. J. [#18-3], Ex. C.  From this footage, the viewer can observe Givens periodically checking Cell E as part of his suicide watch

responsibilities.  A check essentially consists of Givens approaching Cell E's door, pulling back the small metal plate covering the window, and peeking inside the cell where Schroeder was being kept. The Court has reviewed the footage, which begins at approximately 11:00 a.m. on May 6, 2011, and Givens checked on Schroeder at the following approximate times: (1) 11:04; (2) 11:15; (3) 11:25; (4) 11:32; and (5) 11:43.  On this check at 11:43, Givens observed Schroeder sitting up on his bed. Texas Ranger Report, at ¶ 1.24.  Givens asked Schroeder if he was doing okay, and Schroeder indicated in the affirmative. *Id.*  At approximately 11:56, Givens checked on Schroeder, but did not note this check on the Inmate Welfare Check form.  Givens apparently did not write down the check because he was in a rush to go to the restroom. *Id.*  Givens observed Schroeder standing and moving or turning slowly. *Id.*

Around 12:10, Givens re-entered the booking area outside of Cell E with a new detainee he intended to process.  Givens went to check on Schroeder and saw him standing very still with his back to the door. *Id.* at ¶ 1.25.  Givens looked more closely and realized Schroeder was hanging by his neck. *Id.*  Schroeder had taken two socks, soaked them in water, tied them together, wedged them into the steel frame covering the light bulb on the ceiling of Cell E, and used them as a ligature. *Id.* at ¶¶ 1.25, 1.28.  Givens opened the cell immediately and used a knife to cut the socks. *Id.* at ¶ 1.25.  He immediately went to the jailer's office, called the dispatcher, and instructed them to call Fredericksburg EMS. *Id.*  He returned to Schroeder with the CPR and resuscitation mask and started performing CPR on Schroeder until EMS arrived and took over. *Id.*  Schroeder was taken to the hospital and eventually died on May 10, 2011.

Plaintiffs filed their Original Complaint [#1] on December 14, 2012.  The Plaintiffs are: (1) the Estate of Damion Michael Schroeder, Michael Schroeder, and Sandra I. Keyser, as parents

and estate representatives of Damion Michael Schroeder (The Schroeder Estate); and (2) Anne M. Clancey as parent and next friend of L.G.C., the minor child of Damion Michael Schroeder (Clancey).  Plaintiffs filed an Amended Complaint on June 19, 2013, asserting claims against the following Defendants: (1) Reagan Givens in his individual capacity; (2) Gillespie County; (3) the Gillespie County Sheriff's Department; and (4) Sheriff Buddy Mills in his official capacity.  *See* Am. Compl. [#12], at 1–2.  Plaintiffs did not sue Jailers Burrer, Carter, or Kenzie.  While the Amended Complaint is not a model of clarity, the Court construes it as asserting claims against all four Defendants under 42 U.S.C. § 1983 premised on alleged violations of Schroeder's rights under the Eighth and Fourteenth Amendments to the Constitution.

Defendants filed their Motion for Summary Judgment [#18] along with a Supplement [#42]. In short, Defendants argue: (1) Gillespie County Sheriff's Department lacks jural existence and should be dismissed from this case; (2) Mills and Givens, in their individual capacities, are entitled to qualified immunity; and (3) Plaintiffs have failed to establish a custom or policy of Gillespie County was a direct proximate cause of the alleged constitutional violation.  The motion is now ripe for the Court's review.

**Analysis**

I.      **Legal Standard—Summary Judgment**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury

could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  *Matsushita*, 475 U.S. at 586.  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *Id.*  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.*  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element

essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.   Application

As an initial matter, the Court observes the State's exercise of its power to hold pretrial detainees and prisoners brings with it the responsibility under the U.S. Constitution to "tend to essentials of their well-being." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc) (*Hare II*).   "Pretrial detainees and convicted prisoners, however, look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Id.* at 639.   While "[t]he constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, and, with a relatively limited reach, from substantive due process . . . [t]he constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Id.*

Schroeder was a pretrial detainee while in custody of Gillespie County.   Consequently, Plaintiffs' constitutional claims arise out of the Fourteenth Amendment, and although "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement," Plaintiffs still may not technically assert a claim under the Eighth Amendment. *Hare II*, 74 F.3d at 650.   Therefore, the Court GRANTS Defendants' Motion for Summary Judgment with respect to all of Plaintiffs' claims premised on Eighth Amendment violations.

A.      **Claims Against Gillespie County Sheriff's Department**

The Fifth Circuit established in *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir.

1991), that a plaintiff may not bring a civil rights claim against a servient political agency or

department unless such agency or department enjoys a separate and distinct legal existence.  In

*Darby*, the Fifth Circuit reasoned:

> In order for a plaintiff to sue a city department, it must "enjoy a separate legal
> existence."  Pursuant to these principles, we have held that a political subdivision
> cannot pursue a suit on its own unless it is "a separate and distinct corporate entity."
> Accordingly, our cases uniformly show that unless the true political entity has taken
> explicit steps to grant the servient agency with jural authority, the agency cannot
> engage in any litigation except in concert with the government itself.

*Darby*, 939 F.2d at 313–14 (internal citations omitted).  Because the plaintiff failed to show the city

ever granted its police department the capacity to engage in separate litigation, the plaintiff was

seeking recovery from a legal entity that did not exist for his purposes.  *Id.* at 314.  On these grounds,

the court affirmed the district court's dismissal of the plaintiff's claims.  *Id.*

Similarly, the Plaintiffs in this case have sued the Gillespie County Sheriff's Department but

have failed to show Gillespie County has ever granted the Sheriff's Department the legal capacity

to engage in separate litigation.  Therefore, Plaintiffs' § 1983 claims seek recovery from a legal

entity that does not exist for Plaintiffs' purposes.  Because Plaintiffs have failed to show the

Gillespie County Sheriff's Department actually has jural existence, their claims against this

Defendant must be dismissed.  *See, e.g., Crull v. City of New Braunfels, Tex.*, 267 F. App'x 338,

341–42 (5th Cir. 2008) (unpublished); *Von Minden v. Jankowski*, No. A-06-CA-823-LY, 2007 WL

1958615, at *2–3 (W.D. Tex. July 3, 2007); *Smith v. Porter*, No. 3:06-CV-691-H, 2006 WL

3325674, at *5 (N.D. Tex. Nov. 13, 2006); *Patterson v. Kaufman Cnty. Det. Ctr.*, No. 3:05-CV-962-

D, 2005 WL 1421813, at *1 (N.D. Tex. June 13, 2005).

Therefore, the Court GRANTS Defendants' Motion for Summary Judgment with respect to

all claims against Defendant Gillespie County Sheriff's Department.

**B.      Claims Against Givens**

Plaintiffs have sued Givens in his individual capacity, and Givens has asserted the defense

of qualified immunity.  The Court makes two inquiries to determine whether a government official

is entitled to qualified immunity from claims brought against him in his individual capacity.  The

Court asks whether the plaintiff has alleged a violation of a clearly established constitutional right,

and if so, whether the defendant's conduct was objectively reasonable in light of the clearly

established law at the time of the incident.  *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th

Cir. 1998) (*Hare III*).

With respect to the first query, Plaintiffs have alleged Givens knew Schroeder was exhibiting

suicidal tendencies by virtue of his suicide attempt on May 5, 2011, and Givens's actions including,

among others, placing an actively suicidal detainee in an isolated cell, checking on him in a cursory

fashion at fifteen minute intervals, and failing to inspect the cell and find the socks eventually used

as the ligature constituted deliberate indifference to Schroeder's serious medical needs.  Plaintiffs

have therefore alleged Givens violated a clearly established constitutional right.  *See Hare III*, 135

F.3d at 326.

The second prong of the qualified immunity test is better understood as two separate

inquiries: whether the allegedly violated constitutional rights were clearly established at the time of

the incident; and if so, whether the conduct of the defendant was objectively unreasonable in light of that then clearly established law. *Id.*

In order to determine whether the allegedly violated constitutional rights were clearly established at the time of the incident, the Court must first address the issue of whether this case is an "episodic acts or omissions" case as compared to a "condition of confinement" case because the standard to be applied hinges upon this classification. *See Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). A "condition of confinement" case is a "'[c]onstitutional attack[] on general conditions, practices, rules, or restriction of pretrial confinement.'" *Id.* (quoting *Hare II*, 74 F.3d at 644). In such cases, the reasonable relationship test of *Bell v. Wolfish*, 441 U.S. 520 (1979), is applicable because it can be "safely assume[d]" the municipality, by the very promulgation and maintenance of the complained-of condition, intended to cause the alleged constitutional deprivation. *Scott*, 114 F.3d at 53 (citing *Hare II*, 74 F.3d at 645). Under *Wolfish*, a constitutional violation exists only if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. *Scott*, 114 F.3d at 53 (citing *Hare II*, 74 F.3d at 640).

On the other hand, an "episodic acts or omissions" case occurs "where the complained-of harm is a particular act or omission of one or more officials," and these cases are "not amenable to review under the *Wolfish* test." *Scott*, 114 F.3d at 53 (citing *Hare II*, 74 F.3d at 645). In an "episodic act or omissions" case, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott*, 114 F.3d at 53. Because the focus of the claim is one individual's misconduct, the detainee is required to prove intent—specifically, that one or more jail officials

"acted or failed to act with deliberate indifference to the detainee's needs." *Hare II*, 74 F.3d at 648. "[T]he reasonable-relationship test employed in conditions cases is 'functionally equivalent to' the deliberate indifference standard employed in episodic cases." *Scott*, 114 F.3d at 54 (quoting *Hare II*, 74 F.3d at 646).

With respect to the claims against Givens in his individual capacity, the Court concludes they are more appropriately characterized as the Plaintiffs faulting Givens for his acts or omissions and pointing derivatively to the suicide prevention policy as permitting or causing these acts or omissions. In other words, these claims are based on the "episodic acts or omissions" of Givens, and the Court applies the deliberate indifference standard. Concerning the claims against Sheriff Mills in his official capacity and Gillespie County, however, the Court concludes they are more appropriately characterized as a constitutional attack on the jail's suicide prevention policy and rules, and the general conditions they created during Schroeder's pretrial confinement. In other words, these claims are based on "conditions of confinement," and the Court applies the *Wolfish* test. The claims against Mills in his official capacity and the county are addressed below in Parts II(C)–(D).

Having established this case is an "episodic acts or omissions" case with respect to the claims against Givens, the Court returns to the question of whether the allegedly violated constitutional rights were clearly established at the time of Schroeder's suicide. "[A]t least since 1989, it has been clearly established that officials will only be liable for episodic acts or omissions resulting in the violation of a detainee's clearly established constitutional rights if they 'had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393–94 (5th Cir. 2000)

-11-

(quoting *Hare II*, 74 F.3d at 650). Therefore, the allegedly violated constitutional rights were clearly established at the time of Schroeder's suicide.

The next question then becomes whether Givens's conduct was objectively unreasonable in light of that then clearly established law. In other words, the Court must hold Givens to the standard of subjective deliberate indifference in determining whether his conduct was objectively reasonable. *See Hare III*, 135 F.3d at 327. The Fifth Circuit explained "the somewhat confusing relationship" between the deliberate indifference and objective reasonableness standards as follows:

> . . . for [an] appeal on qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident . . . . And under that standard—the minimum standard not to be deliberately indifferent—the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable.

*Jacobs*, 228 F.3d at 394 (quoting *Hare III*, 135 F.3d at 328).

To understand whether Givens's conduct was objectively unreasonable when applied against the deliberate indifference standard, the Court must first outline what it means to be deliberately indifferent. "'Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind.'" *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009) (quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)). To show subjective deliberate indifference, Plaintiffs must present evidence: (1) Givens had subjective knowledge of "facts from which an inference of substantial risk of serious harm could be drawn," (2) Givens drew that inference, and (3) Givens's response to the risk indicates he "subjectively intended the harm to occur." *Id.* (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 458–59 (5th Cir. 2001)). "[T]he constitutional standard must step up from negligence [and] must be more than mere or even gross negligence." *Hare II*, 74 F.3d at 645. Similarly, to be deliberately indifferent, "an officer's

-12-

acts must constitute at least more than a mere 'oversight.'" *Jacobs*, 228 F.3d at 395 (quoting *Lemoine v. New Horizons Ranch and Ctr., Inc.*, 174 F.3d 629, 635 (5th Cir. 1999)).

In this case, Givens was certainly aware when he came on duty around 6:00 a.m. on May 6 that on May 5, Schroeder had torn a piece of blanket and tied it to a fixture in his cell in what the officers on duty at the time interpreted to be actions toward a suicide attempt. *See* Givens Depo., at 83:16–84:3. Furthermore, Givens understood this event led the jailers on duty to put Schroeder on fifteen-minute suicide watch, and Givens took over this watch when he came on duty May 6. *See id.*, at 87:2–9. Although Givens was aware of the suicide risk, the Court concludes, based on the record, his actions were not unreasonable in light of the deliberate indifference standard. While the Plaintiffs claim Givens was deliberately indifferent for placing Givens in an isolated cell and checking on him only every fifteen minutes rather than continuously, Givens was merely doing as he was instructed. When Givens arrived at the jail the morning of May 6, Schroeder had already been placed in Cell E under the fifteen minute suicide watch, and Givens continued this program. Givens essentially complied with his responsibilities to check every fifteen minutes, and these actions were consistent with the suicide prevention policy in place at the Gillespie County Jail at the time. This suicide prevention policy, which will be discussed in more depth in Part II(D) below, essentially required jail officials dealing with a detainee exhibiting suicidal behavior to: (1) notify the on-call physician; and (2) based on the physician's evaluation and recommendation, observe the detainee "on a continuous basis or with frequent checks of at least thirty minutes." Pl.'s Resp. [#24-4], Ex. 4, at 2–3 (January 2009 Suicide Prevention Policy).

By checking on Schroeder every fifteen minutes, Givens complied with then-existing policies. The requirement in the policy, however, that a competent medical authority be contacted

in the event of a suicidal event by a detainee was seemingly not followed before Givens came on duty. The record indicates no medical authority was contacted after Jailer Burrer discovered Schroeder with a torn bed sheet tied around a potential tie-off point. *See* Defs.' Mot. Summ. J. [#18-2], Ex. A (Mills Depo), at 21:15–22:18 (Sheriff Mills explaining that based on his review of the records and the Texas Ranger Report, there was no indication any medical authority was ever contacted concerning Schroeder and his suicide risk). Givens, though, did not enter the picture until the next day and was not on duty—or even at the jail—at the time of these events on May 5. Givens indicated in his deposition he could not recall whether anyone ever told him if the relevant medical authority had been called after the May 5 event, and he did not remember contacting a medical authority himself. Givens Depo., at 84:14–85:8. Assuming Givens failed to inquire whether anyone had contacted a competent medical authority and failed to contact such an authority himself, such an omission would more fairly be described, at worst, as an "oversight" or "negligent," but would not amount to deliberate indifference. Givens took over a situation the jailers before him had put in place, and Givens—perhaps mistakenly—relied on his fellow jailers to have complied with jail policies.

Similarly, Givens's failure to know of or discover the presence of socks in Cell E does not rise to the level of deliberate indifference. The fact Schroeder had socks with him in his cell was clearly a mistake. Unsurprisingly, the January 2009 Suicide Prevention Policy instructed jailers to remove objects from the cells, which suicidal detainees might use to harm themselves, and the policy specifically warns that a common means of suicide is hanging by using parts of clothing. *See* January 2009 Suicide Prevention Policy, at 3. Therefore, once Schroeder was placed on suicide watch in Cell E, he should have had his socks taken from him. Jailer Burrer told the Texas Ranger

-14-

later conducting the investigation that Schroeder was wearing two different colored socks at the time he was placed in Cell E. *See* Texas Ranger Report, ¶ 1.26. According to Givens, Schroeder was barefoot at the time he was removed from his cell for magistration the morning of May 6. As far as Givens knew, Schroeder did not have socks in his cell. While Givens could have entered and inspected Cell E once he was on duty to ensure there were no potentially harmful objects, he did not do so. This arguably was negligent behavior, but the Court does not find it to constitute deliberate indifference.

The record also indicates Givens checked on Schroeder approximately every fifteen minutes, and as soon as Givens saw Schroeder had hung himself, he immediately took action by cutting Schroeder down, calling for help from EMS, grabbing the CPR and resuscitation mask, and performing CPR on Schroeder until EMS arrived to take over. On these facts, the Court concludes Givens's conduct was not objectively unreasonable when applied against the deliberate indifference standard.

The Fifth Circuit reached a similar conclusion in *Jacobs* in which the survivors of a pretrial detainee who committed suicide brought suit against the sheriff, a senior deputy, and a newly hired deputy who was on duty at the time of the suicide in their individual capacities. *Jacobs*, 228 F.3d at 390. The district court denied a motion for summary judgment asserting qualified immunity, and the three defendants filed an interlocutory appeal. *Id.* at 392. The Fifth Circuit affirmed the denial of the motion concerning the sheriff and the senior deputy, but held the newly hired deputy who was merely following orders was entitled to qualified immunity. *Id.* The court found the record could support a jury finding that the sheriff acted with deliberate indifference because: (1) he knew the detainee exhibited a suicide risk but placed her in obviously inadequate conditions; and (2) he

-15-

ordered she have a blanket and towel even though these items should not be in hands of suicidal detainees. *Id.* at 397. The court reached the same conclusion concerning the senior deputy because: (1) he knew the detainee was a suicide risk; (2) he knew about an earlier detainee suicide which occurred in the same holding cell; (3) he knew the cell at issue was inadequate due to a blind-spot for observational purposes and the presence of multiple tie-off points putting him on notice of the obviously inadequate conditions; (4) despite this knowledge, he ordered the detainee be placed in this cell for suicide watch; (5) he did not remove the sheet the detainee had been given; and (6) he did not observe the detainee as frequently as he was supposed to. *Id.*

In contrast, the court concluded no reasonable jury could find the deputy on duty at the time, who had only been on the job about six months, acted with deliberate indifference. *Id.* at 398. Further, the court found the deputy acted reasonably entitling him to qualified immunity. *Id.* The court's conclusions were based on the fact the deputy was "essentially following orders" in that he did not make the decision to place the detainee in the cell at issue, and he did not order she have a blanket and towel. *Id.* Moreover, the deputy was not aware of the previous suicide at the jail in the same cell. *Id.* While the court noted the deputy had failed to comply with the unwritten policy to check on suicidal detainees every fifteen minutes, this failure "evinces at best, negligence on the part of [the deputy], which is insufficient to support a finding of deliberate indifference." *Id.*

The deputy in *Jacobs* and his role in the detainee's suicide is closely analogous to Givens and his actions in this case. Givens was "essentially following orders," and he was not involved in any of the crucial events or decisions such as: creating the jail's suicide watch policy, being witness to Schroeder's suicidal actions May 5, choosing to put Schroeder on suicide watch, placing Schroeder in isolation in Cell E, and allowing Schroeder to enter Cell E with his socks. Givens took over

suicide watch and met his obligation to check on Schroeder every fifteen minutes. He also took immediate responsive action to try to save Schroeder's life once he saw him hanging in his cell.

Accordingly, Givens is entitled to qualified immunity with respect to Plaintiffs' claims against him in his individual capacity, and the Court GRANTS Defendants' motion for summary judgment concerning those claims.

## C.    Claims Against Mills

Plaintiffs have sued Sheriff Buddy Mills in his official capacity but not his individual capacity. Therefore, while Defendants assert Mills is entitled to qualified immunity, Mills has not been sued in his individual capacity, and the Court need not address whether Mills is entitled to qualified immunity.

A suit against an official in his official capacity is a suit against the employing governmental entity, not the individual officer. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a party in the violation of federal law.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Thus, the Court analyzes Plaintiffs' constitutional claims against Mills in his official capacity in the same way it analyzes whether the County itself violated those rights.

## D.    Claims Against Gillespie County

Plaintiffs seek to establish liability against Gillespie County contending Sheriff Mills, the policymaker for Gillespie County with respect to its jail, was deliberately indifferent in adopting and interpreting the 2009 Suicide Prevention Policy and abandoning the previous policy adopted by his predecessor sheriff, which was more protective.

To establish a county's liability on a § 1983 claim, a plaintiff must show the county had some inadequate custom or policy that acted as the moving force behind a constitutional violation. *Forgan v. Howard Cnty., Tex*, 494 F.3d 518, 522 (5th Cir. 2007) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). In other words, a plaintiff must provide proof of three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

As discussed above in Part II(B), the Court concludes these claims against Gillespie County and Sheriff Mills in his official capacity, which essentially challenge the suicide prevention policy, are based on "conditions of confinement," meaning the reasonable relationship test of *Bell v. Wolfish* applies. Under *Wolfish*, a constitutional violation exists only if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. *Scott*, 114 F.3d at 53 (citing *Hare II*, 74 F.3d at 640).

The Fifth Circuit addressed municipal liability in the context of a suicide prevention policy in *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992), a case both sides cite to support their respective positions. The mother of a pretrial detainee who had committed suicide brought an action against the county and its sheriff in his official capacity under § 1983 for failing to provide her son with reasonable medical care. *Id.* at 388. The court stated the surviving mother could recover under § 1983 only if she showed some county custom or policy caused the Henderson County jail staff to deprive her son of reasonable medical protection from his own suicidal tendencies. *Id.* at 392 (citing *Burns v. City of Galveston, Tex.*, 905 F.2d 100, 102 (5th Cir. 1990)). The court explained a municipal "policy" must be a deliberate and conscious choice by the policymaker, and a

policymaker's failure to adopt a precaution can be the basis for § 1983 liability if the omission amounts to an intentional choice, not merely an unintentionally negligent oversight. *Rhyne*, 973 F.2d at 392 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387–89 (1989)).  Municipal failure to adopt a policy does not constitute an intentional choice unless it was "deliberately indifferent," which is to say "it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne*, 973 F.2d at 392 (citing *City of Canton*, 489 U.S. at 390).

Applying these principles, the court in *Rhyne* ultimately found the plaintiffs had failed to provide sufficient evidence to create a jury question concerning whether the county had acted with deliberate indifference in adopting policies regarding care of inmates known to be suicidal, and no reasonable jury could find the county adopted policies creating an obvious risk that pretrial detainees' constitutional rights would be violated. *Id.*  Specifically, the plaintiff mother had challenged both the county's existing policies and its failure to adopt adequate ones, including most relevantly to this case, the county's failure to adopt a policy of continuously observing suicidal inmates. *Id.* at 392–93.  The court noted the county's policy of checking on suicidal inmates every ten minutes was about six times as often as non-suicidal inmates were checked, which indicated concern, not indifference. *Id.* at 393.  While the court acknowledged the periodic checks may have been inadequate, the court found the plaintiff had failed to provide any evidence to support this contention. *Id.*  Such evidence could have included: (1) evidence of previous suicide attempts at the jail, which would have alerted the sheriff to the need for more frequent checks; (2) evidence of objective jail standards requiring continuous watches as opposed to every ten minutes; (3) or any evidence indicating a higher level of care was obviously necessary. *Id.*

-19-

Judge Goldberg concurred, agreeing with the court's finding of evidentiary deficiencies and its ultimate conclusion. *Id.* at 395. Judge Goldberg, however, was concerned with jails' methods for handling the mental health needs of pretrial detainees and offered the following warning to policymakers like Sheriff Mills in this case:

> Fortunately, the policymakers in charge can learn from [the Henderson County jail officials'] mistakes and take necessary additional steps to insure the safety of pretrial detainees in need of mental health care. Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.
>
> What we learn from the experiences of Henderson County is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice . . .
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.

*Id.* at 395–96.

In this case, Plaintiffs contend the Gillespie County suicide prevention policies and practices adopted and implemented by Sheriff Mills demonstrate deliberate indifference to the medical needs of suicidal detainees. The policy in place at the time of Schroeder's detention, which was adopted by Sheriff Mills, provided in relevant part:

> When an inmate exhibits behavior that is suicidal or homicidal the <<Jail_Administrators>> will immediately notify the on-call physician of the observed actions and provide details of observations. The on-call physician will

determine if additional support or evaluation is warranted. While awaiting medical assistance, the inmate may be held in medical locked or watch status [if facilities are available] and will be more frequently observed by staff.

Once a medical or psychiatric evaluation is completed the <<Jail _Administrator>> will be notified by the medical professional if changes in the normal watch procedure are required or recommended. The recommendations of the medical professional will be followed for the period indicated.

. . .

Inmates determined by competent medical authority to be a suicide risk will be placed in medical locked or watch status, or placed in general population depending on the recommendations of the physician(s). If suicidal, the inmate will be under watch by at least one officer. This watch can be on a continuous basis or with frequent checks of at least every thirty [30] minutes. During these inspections, the officer will visually observe the inmate.

January 2009 Suicide Prevention Policy, at 2–3.

Plaintiffs argue Sheriff Mills deliberately abandoned a suicide prevention policy which would have saved Schroeder's life. Plaintiffs provide the Court with a previous policy in place at the Gillespie County Jail, which they obtained from the filings in another case which was before this Court in 2007. This case involved the 2003 suicide of a pretrial detainee named Clara George at the Gillespie County Jail, and the policy in place at the time had been adopted in 1992. *See Cedillo v. Jung*, No. A-05-346-LY (W.D. Tex. Dec. 13, 2007). The 1992 Policy provided in relevant part:

4.2    Housing of inmates that have exhibited signs of contemplating suicide shall normally be in a dormitory setting, unless prevented by other known institutional behavior such as homicidal tendencies or aggressive sexual assaultiveness.

4.3    Housing of inmates not capable of dormitory assignment as described in 4.2, along with inmates who have committed an overt act toward suicide shall be placed in a separation cell and kept under continuous observation until transportation can be arranged to move the inmate to the Kerrville State Hospital.

. . .

> 5.1    Inmates identified or exhibiting signs of suicide risk will be observed four (4)
> times per hour at staggered intervals.

Pl.'s Resp. [#24-3], Ex. 3, at 3 (December 1992 Suicide Prevention Policy).

Plaintiffs contend Schroeder had committed an overt act toward suicide and was *actively* suicidal rather than *potentially* suicidal. Plaintiffs argue if the December 1992 Policy had been in place and followed, Schroeder would have been under continuous observation. The January 2009 Policy directs a jail officer, when confronted with an inmate exhibiting suicidal behavior, to contact the on-call physician, and based on the physician's evaluation, the detainee will be observed anywhere from continuously up to every thirty minutes. When Jailers Burrer and Carter discovered Schroeder on May 5 exhibiting suicidal behavior, they apparently did not contact any physician but made the decision themselves to place Schroeder in Cell E to be observed every fifteen minutes.

Defendants contend the January 2009 Policy was approved by the Texas Commission on Jail Standards (TCJS) and was consistent with the TCJS's regulations. Defendants provided an affidavit from Diana Spiller, the Custodian of Records for the TCJS, indicating: (1) Gillespie County Jail had been inspected and deemed "in compliance" in January 2011 and December 2011; (2) Gillespie County has maintained an approved "Mental Health/Suicide Prevention Plan on file" with the TCJS; and (3) "a fifteen minute observation for suicidal inmates is within the minimum standards" set by the TCJS. *See* Defs.' Supp. [#42-1], Ex. G.

Plaintiffs, though, provided their own affidavit from Spiller which indicated: (1) Gillespie County had submitted a new mental disabilities/suicide prevention plan in December 2012 after the Schroeder suicide, and this new policy had been approved in February 2013; and (2) prior to this

February 2013 approval, the last time the TCJS approved a plan from Gillespie County Jail was in 2004. *See* Pls.' Supp. [#44-1], Ex. 18.

Based on Spiller's two affidavits, it appears the December and January 2011 inspections did not involve specific review and approval of a suicide prevention policy. The only policies approved by the TCJS were: (1) the December 1992 Policy, (2) some policy from 2004, which has not been produced despite Plaintiffs' requests; and (3) the current policy approved in February 2013. The January 2009 Policy adopted by Mills was seemingly never approved by the TCJS despite Defendants' representation to the contrary.

The fact the policy approved in 2004 has never been produced by the Defendants is troubling because it was the policy most recently approved by the TCJS at the time of Schroeder's detention. It was also the policy presumably in place at the time Sheriff Mills adopted the January 2009 Policy. When Plaintiffs requested production of all policies from 2003—the time of the Clara George's suicide—to the January 2009 Policy, Defendants objected, calling the request "vague, overly broad, unreasonably burdensome and is propounded solely for the purpose of harassing this defendant." *See* Pls.' Supp. [#44-2], Ex. 19. Defendants pointed Plaintiffs to the documents they already produced, which amounted to the 1992 Policy and the 2009 Policy, but not the 2004 policy. *Id.*

This policy from 2004 goes directly to the question of whether Sheriff Mills was deliberately indifferent in adopting the January 2009 Policy and whether the January 2009 Policy was reasonably related to a legitimate, non-punitive governmental objective. In his deposition, Sheriff Mills indicated he reviewed the prior written policy adopted under the previous sheriff when he was formulating the policy adopted in January 2009, but it was not the December 1992 Policy. *See* Mills

Depo., at 26:24–27:17.  The only other policy Sheriff Mills could have been reviewing was the one

approved by the TCJS in 2004, but Defendants have not produced this policy.

Even if the January 2009 policy had not been actually approved by the TCJS, Defendants

argue the January 2009 Policy complied with the TCJS regulations based on Spiller's brief statement

that "a fifteen minute observation for suicidal inmates is within the minimum standards."  This mere

statement is not a substitute for actual approval, and other TCJS sources cast doubt on whether the

January 2009 Policy would have been in compliance with TCSJ standards.  For instance, the TCJS

issued a Guide for Development of Suicide Prevention Plans in 1991, which recommended policies

specify between three levels of supervision for different levels of suicide risk:

1.  Continuous observation for high risk, acutely suicidal inmates who have either verbalized specific plans to commit suicide or have attempted suicide, specify how this is to be accomplished.

2.  15-minute observation for moderate risk suicidal inmates released from constant observation, inmates that have a prior history of suicidal behavior but no apparent intent at present, manipulative inmates that threaten suicide but are not judged to be legitimately suicidal, and inmates who are too intoxicated to complete intake screening or refuse to participate in the process.

3.  30-minute observation for low risk suicidal inmates released from 15-minute observation.  (NOTE: This is not an all inclusive list of different suicide types and should be expanded upon in each county's plan.)

*See* Pls.' Mot. Summ. J. [#24-6], at 4.

The December 1992 Policy required continuous observation for those who have committed

an overt act toward suicide and 15-minute observation for those exhibiting signs of suicide risk.

Whether the 2004 Policy distinguished between risk levels and required continuous observation of

those who have attempted suicide is unknown as it has not been made available. The policy adopted

in February 2013 after Schroeder's death adopted three levels of observation depending on risk similar to the TCJS's 1991 Guide: (1) 30-minute observation for "all suicidal . . . inmates who are considered low risk;" (2) at least 15-minute observations for "moderate to high risk suicidal . . . inmates;" and (3) "continual or at least 5 minute observation for High Risk, acutely suicidal inmates who have either verbalized specific plans to commit suicide or have attempted suicide." *See* Pls.' Supp. [#44-1], Ex. 18 (attached to Spiller's Affidavit).

The January 2009 Policy, however, does not distinguish between risk levels and merely instructs jailers who observe suicidal behavior to contact the relevant on-call physician who will make recommendations, and an inmate under suicide watch can be observed anywhere from a continuous basis to every thirty minutes.  In his deposition, Sheriff Mills describes a policy different from the written one.  He states if an inmate attempts suicide, then a jailer is to remove them from the general cell and put them under 15-minute observation in Cell E.  *See* Mills Depo, 34:24–35:15. Then, if the jailer "feels the need to contact [Mental Health and Mental Retardation or MHMR], they will contact [MHMR], or the EMS if they're having – beating their head against the wall or something of that sort, and they will in turn get in touch with an on-call doctor." *Id.* According to Sheriff Mills, the jailers have the discretion to determine whether a detainee should be on suicide watch and whether to contact any medical authority.  *See id.* at 34–35, 50.  Mills stated the jailers' decision in this case not to contact the medical authority was compliant with jail policy despite the written policy's instruction to contact the on-call physician for an inmate exhibiting suicidal behavior.  *Id.* at 88.  Moreover, Sheriff Mills represents the jail policy, at least at the time of Schroeder's detention, did not distinguish between levels of risk, and "potentially suicidal" inmates

were treated the same as "actively suicidal" ones. *Id.* at 35–36. Mills does not describe a situation in which continuous observation is required.

Examining this record, the Court concludes there are genuine issues of fact concerning the Plaintiffs' policy-related claims against the County and Sheriff Mills in his official capacity. First, the Plaintiffs have presented proof of a policymaker in Sheriff Mills. Second, they have presented proof of an official policy both through the January 2009 Policy as written and Sheriff Mills' description of jail policy in practice. Third, there are genuine issues of fact concerning whether the prevailing policies at the time of Schroeder's detention were the "moving force" behind a constitutional violation. Under *Wolfish*, a constitutional violation exists only if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. On this record, it is unclear if the January 2009 Policy was reasonably related to some legitimate, non-punitive governmental objective. Defendants have failed to produce the 2004 Policy, making it difficult to determine the ways in which Sheriff Mills changed the suicide prevention policy and why he may have done so. Furthermore, the January 2009 Policy was not approved by the TCJS. While the Custodian of Records at the TCJS stated a 15-minute observation for suicidal inmates is within minimum standards, the TCJS recommends policies distinguishing between different suicide risk levels as well as continuous observation for those who have attempted suicide. Both the 1992 Policy and the current 2013 Policy follow these recommendations, but the January 2009 Policy as written and in practice did not.

Unlike the Plaintiffs in *Rhyne* who had failed to provide evidence to create a jury question concerning whether the county acted with deliberate indifference in adopting its suicide prevention policy, the Plaintiffs here have presented evidence on this issue. For instance, the Plaintiffs have

-26-

presented evidence the TCJS never approved the January 2009 Policy, evidence the January 2009 Policy was not in compliance with TCJS recommendations, and evidence of other policies in place both before and after the January 2009 Policy, which were both TCJS-approved, both distinguished between levels of suicidal risk, and both called for continuous observation of detainees who had actually attempted suicide. In contrast, the policies under Sheriff Mills from 2009 to 2012 called for a detainee like Schroeder to be placed in isolation and checked every fifteen minutes by peeking through a small window in a metal door guarding a cell otherwise immune to any form of observation with a light fixture that could serve as a tie-off point.

Beyond this evidence, the Court is moved by Judge Goldberg's warnings from more than two decades ago, explicitly telling jailers and counties to learn from the mistakes of Henderson County and "take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies." *Rhyne*, 973 F.2d at 395–96. Even more specifically, Judge Goldberg made clear observing a detainee prone to committing suicide "on a periodic, rather than continuous basis[] will not suffice." Id.

In light of this record and these notices, it cannot be said no reasonable jury could find Sheriff Mills and Gillespie County were deliberately indifferent and adopted policies creating an obvious risk that pretrial detainees' constitutional rights would be violated. Therefore, the Court DENIES Defendants' Motion for Summary Judgment concerning the claims against Gillespie County and Sheriff Mills in his official capacity.

### Conclusion

Gillespie County Sheriff's Office lacks jural existence and may not be sued. Deputy Givens has shown he is entitled to qualified immunity on the claims against him in his individual capacity.

-27-

Plaintiffs cannot maintain § 1983 claims premised on violations of the Eighth Amendment because Schroeder was a pretrial detainee, not a convicted prisoner.  The only remaining Section 1983 claims are those premised on Gillespie County's suicide prevention policy as formulated and instituted by Sheriff Mills.  Plaintiffs have presented evidence sufficient to create a genuine issue of material fact on these claims, making summary judgment inappropriate.

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [#18] is GRANTED in part and DENIED in part as described in this order.

SIGNED this the 2nd day of June 2014.

SAM SPARKS
UNITED STATES DISTRICT JUDGE